UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

KENNETH C. PEARSON,

        Plaintiff,

   v.                                      Case No. 08-C-114

VOITH PAPER ROLLS INC.,
SALARIED PENSION PLAN,

        Defendant.

## DECISION AND ORDER GRANTING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff Kenneth C. Pearson filed this action against defendant Voith Paper Rolls Inc. Salaried Pension Plan ("the Plan"), seeking retirement benefits he claims he is entitled to under the terms of the Plan. Alternatively, Pearson claims the Plan is estopped from denying him the higher monthly benefit he was told he was entitled to receive when he was negotiating a severance package with his employer. The Plan is governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq*., and thus federal jurisdiction arises under 29 U.S.C. § 1132(e)(1). Plaintiff now concedes that the Plan has offered to pay him the full amount of the monthly retirement benefit that he is entitled to receive under the terms of the Plan, and has therefore stipulated to the dismissal of his benefits claim. What remains is his claim that the Plan is estopped from denying him the higher benefit he was told he could receive before signing a Separation Agreement and General Release with his former employer. The Plan has now moved for summary judgment on that claim, and for the reasons that follow, its motion will be granted.

## BACKGROUND

Pearson began working in 1992 for Scapa Group, Inc. ("Scapa"), a company in Neenah, Wisconsin. (DPFOF ¶¶ 5-6; Pl.'s Add'l PFOF ¶ 1.) Voith Paper Service, Inc. ("Voith") acquired Scapa sometime in 1999, at which point Pearson began working for Voith until his employment was terminated in September 2006. (DPFOF ¶¶ 7-8; Pl.'s Add'l PFOF ¶ 2.) Before he was terminated Pearson had ascended from his position as Product Technical Manager at the time Voith acquired Scapa in 1999 to Vice President and General Manager of the Neenah facility, making him responsible for a $20 million per year business and 112 employees. (DPFOF ¶¶ 22-23; Pl.'s Add'l PFOF ¶ 3.)

Pearson participated in the Voith funded and sponsored Plan, which is a pension plan maintained for the purpose of providing retirement benefits to salaried employees of Voith and various of its subsidiary companies. (*Id*. ¶¶ 8, 10; Booth Decl. ¶ 5.) The Plan is a defined benefit plan and is currently 82.56% funded. (Booth Decl. ¶ 5.) Individual participants do not contribute to the Plan. (DPFOF ¶ 11.) The Plan's Administrator is Joseph Booth, Voith Paper and Fabric Roll Systems' Human Resources Manager. (*Id*. ¶ 12.) Pearson has known Booth since the mid-1990's, enjoyed a good working relationship with Booth and found him to be a truthful person during Pearson's employment. (*Id*. ¶¶ 14-15.)

### Negotiations Over the Separation Agreement and General Release

After notifying Pearson of his termination on September 20, 2006, Voith gave Pearson a general termination letter, some papers relating to his pension benefits, and a Separation Agreement and General Release. (*Id*. ¶ 30.) Voith offered Pearson a severance package which included salary continuation for six months (over $62,000), health insurance coverage for six months, continued

2

use of his company car for over three additional months, a bonus and outplacement services. (*Id*. ¶ 31.) Pearson, who believed he had a potential age discrimination claim against Voith, retained counsel and proceeded to negotiate for a more advantageous severance package. The parties eventually reached an agreement which was reduced to writing. Pearson signed the Separation Agreement and General Release and returned it to Voith on November 14, 2006. (*Id*. ¶¶ 32, 35; Pearson Depo. Ex. 8.) The final agreement differed from Voith's original proposal in that Pearson was to receive an additional six months of health insurance coverage at Voith's expense, an additional $25,000 in bonus pay, and $6,000 in lieu of the outplacement services Voith had previously offered. (*Id*. ¶ 34.) It also included the following provision:

> These terms comprise the entire agreement between me and the Company regarding the subjects addressed and may be amended only by a writing signed by the parties. I acknowledge that the Company has made no representations or promises to me other than those contained in this Agreement. If any provision of this Agreement is found to be unenforceable, all other provisions will remain fully enforceable.

(Doc. 26-1 at 99.)

### Two Calculations of Pearson's Pension Benefits

Prior to the September 20 meeting at which he informed Pearson of his termination, Booth asked Tyler Wiggs, Human Resources Generalist at Voith's office in North Carolina, to prepare calculations of Pearson's retirement benefits under the Plan. (DPFOF ¶¶ 16, 38.) Providing this data to the employee is atypical for Voith, as most Voith employees facing termination are only provided fairly minimal information in a standard pension letter. (*Id*. ¶ 39.) Wiggs ran the numbers and provided the calculations to Booth, who in turn reviewed the calculations. (*Id*. ¶ 40; Wiggs Depo. 51:14-21; Booth Depo. 23:16-23; Booth Decl. ¶ 11, Ex. B.) Booth provided Pearson his pension options by letter dated September 20, 2006, incorporating the values calculated by Wiggs

3

for Pearson's options. (Booth Decl. Ex. C.) The pension benefit election form that Booth gave Pearson indicated Pearson could either take a lump sum payment of $122,288.97 or elect to receive one of four different options over different amounts of time. (*Id*.) The "Five Year Certain" option would result in Pearson or his beneficiary receiving $1,243.97 per month for five years. The "50% Joint & Survivor" option would provide Pearson $1,156.89 for the rest of his life, and if he predeceased his wife, $568.45 per month for the remainder of her life. Both Pearson and his spouse would received $1,069.81 per month for the rest of their lives under the "100% Joint & Survivor" scheme. Finally, the "Straight Life" option would have paid Pearson $1,268.85 monthly for the rest of his life, with no beneficiary. All of the options available to Pearson on the election form were roughly equal in value, as they were actuarial calculations. (DPFOF ¶ 43.)

While the lump sum amount of $122,288.97 listed on the election form was accurate, it was later discovered that all of the options presented Pearson for monthly payments were incorrect under the terms of the Plan. (*Id*. ¶ 44.) Wiggs calculated Pearson's monthly benefit as payable at age 65, though at the time Booth gave Pearson the election form Pearson was only 57. (*Id*. ¶ 45.) The values Wiggs produced were overstated, as Wiggs failed to apply an early retirement reduction factor provided in the Plan. (*Id*.; *see also* Booth Decl. Ex. A at 17.)

Booth reviewed Wiggs' calculations prior to the September 20, 2006 meeting with Pearson, but he failed to realize and correct the erroneous calculations based upon full retirement benefits payable at age 65. (DPFOF ¶ 48; Booth Decl. ¶ 16.) Pearson made his pension benefits payout election on December 29, 2006, after the Separation Agreement and General Release was signed by completing, signing and mailing back to the Plan the election form. (DPFOF ¶ 50.) Pearson elected to receive the "50% Joint & Survivor" option. (Pearson Decl. Ex. D.) Wiggs received the

4

form sometime in the first week of January, and as part of her normal practice she double-checked the pension calculations, at which point she noticed the fact she did not originally calculate the numbers using the Plan's early retirement reduction factor. (DPFOF ¶¶ 51-52.) Wiggs immediately performed a new calculation using the reduction factor, and by letter dated January 9, 2007, the Plan informed Pearson of the discrepancy and provided him a revised election with a benefits commencement date of January 1, 2007. (*Id*. ¶¶ 53-54; Wiggs Depo. 32, 49-50, 55.)

The revised election form sent to Pearson on January 9, 2007, like the initial election form provided to Pearson on September 20, 2006, contained an accurate lump sum payout amount. (DPFOF ¶ 55.) The amount on the revised form was $124,596.28, which was higher than the $122,288.97 on the initial form due to the passage of time between the dates of calculation. (*Id*.) The amounts for the various monthly payout options on the revised election form were significantly lower than the corresponding amounts on the initial election form because the revised election form reflects the proper application of the early retirement reduction factor called for by the Plan. (DPFOF ¶ 56.) Stated another way, the revised form accurately shows the correct amounts of benefits to which Pearson was entitled under the terms of the Plan, had he elected to initiate payment of his benefits in January 2007. (*Id*.) Given the option Pearson elected on the original form, under the revised form he would receive $450.15 less per month for the remainder of his life. Pearson never returned the revised election form, though the Plan has not done anything to interfere with his ability to receive benefits according to the revised options. (*Id*. ¶ 58.)

Pearson registered his disagreement with the revised election form by letter dated February 27, 2007, to which Booth responded by letter dated April 5, 2007. (*Id*. ¶¶ 63-64.) In his letter, Booth explained that the Plan's failure to apply the "Early Retirement Reduction" to the original

5

calculation reflected on the initial election form was merely an error that was not discovered until the year-end audit. (*Id*. ¶ 65.) Booth and Pearson exchanged another round of correspondence, ending with Booth sending Pearson copies of the erroneous benefit calculation from September 2006 and the calculation performed in January 2007. (*Id*. ¶ 66-67.) Dissatisfied with the company's response, Pearson commenced this action for damages.

Pearson's sole remaining claim is that the Plan is estopped from denying him the higher monthly benefit he was told he would received during the negotiations for his severance package. He contends that he relied upon the original calculation he was provided in deciding to accept the terms finally agreed upon. Had he known that the monthly pension payment option he selected was overstated by $450.15, Pearson claims he would not have made the concession he did regarding Voith's payment of his health insurance premiums. Under these circumstances, Pearson claims that the Plan is estopped from denying him the higher benefit, notwithstanding the fact that it was calculated without applying the early retirement discount factor.

## DISCUSSION

Although the Seventh Circuit has recognized a narrow form of estoppel as a matter of federal common law in ERISA cases involving single employer unfunded welfare plan, *see Black v. TIC Investment Corp.*, 900 F.2d 112 (7th Cir.1990), it has never held that an estoppel claim can lie against a funded pension plan such as the defendant here. *Black* noted the resistance of courts to apply estoppel principles against funded ERISA Plans out of "a concern for the actuarial soundness of the ERISA plan." *Id.* at 115. Where, as here, the Plan covers several subsidiary companies, the Court expressed concern that "to allow one employer to bind the fund to pay benefits outside the strict terms of the Plan would be to make all the employers pay for one employer's

6

misrepresentations, and to the extent that such payments damage the actuarial soundness of the Plan, it hurts all the employees as well." *Id.* The Court noted that "[i]t could even encourage employers to make intentional misrepresentations so as to bind the Plan to make improper payments in favor of their own employees." *Id.* Since *Black*, the Court "repeatedly declined to decide whether estoppel reaches beyond this original limitation." *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999) (citing *Russo v. Health, Welfare, & Pension Fund*, 984 F.2d at 767; and *Krawczyk v. Harnischfeger Corp.*, 41 F.3d 276, 280 (7th Cir.1994)).

When it has considered estoppel claims against ERISA plans, the Court has cautioned that the "statements or conduct by individuals implementing the plan can only estop an employer from enforcing the plan's written terms in 'extreme circumstances.'" *Kannapian v. Quaker Oats Co.*, 507 F.3d 629, 636 (7th Cir. 2007) (quoting *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 639 (7th Cir.2004)). To prevail, a plaintiff must show: "(1) a knowing misrepresentation; (2) made in writing; (3) reasonable reliance on that representation by them; (4) to their detriment." *Kannapien*, 507 F.3d at 636 (citing *Vallone*, 375 F.3d at 639 (7th Cir.2004)).

From the foregoing, it seems doubtful that an estoppel claim can lie against the Plan in any event. Even if it could, however, Pearson could not prevail based on the undisputed facts of the case. He simply has no evidence from which a reasonable factfinder could conclude that a knowing misrepresentation was made or that he reasonably relied upon it to his detriment. He cannot show that this case falls within the "extreme circumstances" where such claims have been allowed.

The Seventh Circuit has emphasized that while the common law may sometimes hold parties to the terms of a misleading representation, even if made negligently, the federal common law of ERISA does not recognize negligent misrepresentation as a basis for an estoppel claim. *Coker*, 165

7

F.3d at 585-86 (citations omitted). This is because "the recognition of negligent misrepresentation as a basis for estoppel claims is inconsistent with the policy concern about not undermining the actuarial soundness of an ERISA plan." *Id*. at 586 (citing *Black*, 900 F.2d at 115). To prevail on an estoppel claim against an ERISA plan, a plaintiff must prove that the alleged misrepresentation was made intentionally. Pearson's evidence falls far short.

It is clear from the information itself and the facts and circumstances surrounding the case that the incorrect monthly benefits calculation initially provided to Pearson were the result of human error, and not as part of a conspiracy to wrongfully induce Pearson to accept Voith's offer of lower severance benefits as Pearson appears to suggest. Booth provided the inaccurate information to Pearson at the September 20 meeting when Pearson was first told of his termination before the parties had even commenced their negotiations. Plaintiff has offered no evidence that Wiggs, who provided the erroneous pension information to Booth, was aware of his potential age discrimination claim. Thus, she would have had no reason to misrepresent his retirement benefits. Moreover, only the monthly benefit amount was incorrect, and this was so because Wiggs had failed to apply the early retirement reduction factor. The lump sum payment Pearson was entitled to at the time was correctly stated. Wiggs explanation as to how the error occurred is entirely reasonable, and given the absence of any motive on her part to provide Pearson false information at the time, no finder of fact could find the error was knowing or intentional.

Pearson's estoppel claim also fails because he has no evidence that he suffered any harm as a result of the error. In order to prevail on an estoppel claim against an ERISA plan, a plaintiff must prove detrimental reliance, which requires a showing of economic harm. *Bock v. Computer Associates Intern., Inc.*, 257 F.3d 700, 711 (7th Cir. 2001). Pearson testified that the only action

8

or inaction he took in reliance on the erroneous monthly benefit information he received is that he accepted the company's last offer under which the company agreed to provide health insurance for an additional year after his termination. (DPFOF ¶ 60.) Pearson contends that had he known his monthly pension benefit was less than originally stated, he would have attempted to obtain from Voith a substantial contribution to his health insurance costs over a considerable period of time. But as even Pearson concedes, it is entirely speculative whether he would have been successful in his negotiations. (Pl.'s Br. In Opp. at 31.) This is not sufficient to show the kind of harm required to support a claim of estoppel against an ERISA plan.

Finally and perhaps most importantly, Pearson's estoppel claim against the Plan fails because it was not the Plan that made the misrepresentation to him and allegedly benefitted from it. Under Pearson's theory, his former employer, not the Plan, is the culprit. It was Booth, Voith's Human Resources Manager, who provided the incorrect information to Pearson. Pearson in essence claims that Booth did so intentionally in order to induce him to give up his potential age discrimination claim against Voith and sign the Separation Agreement and General Release which contained less favorable terms than he would have insisted on had he known the correct amount of his monthly pension benefit. If that was the case, or even if as the evidence shows here the misrepresentation was not intentional, then Pearson's remedy would lie against Voith, not the Plan. If the stated monthly pension amount was material to his decision to sign the Agreement, Pearson could have offered to return the benefits he had received from Voith and sought rescission of the Agreement. *See Whipp v. Iverson*, 43 Wis. 2d 166, 168 N.W.2d 201 (1969) ("Rescission of a contract in equity may be grounded on misrepresentations not intentionally made for the purpose of defrauding or inducing a person to act to his detriment for the speaker's economic benefit."). This

9

would have placed Pearson back in the position he was in before Booth gave him the erroneous information concerning his monthly pension benefit and left him free to pursue his negotiations with Voith anew.

Apparently satisfied with the benefits he received, however, Pearson elected not to seek rescission and instead filed suit against the Plan to obtain a higher monthly benefit than he is allowed under the terms of the Plan. He has no claim against the Plan. The Plan made no misrepresentation and gained nothing from Pearson's agreement with Voith. Regardless of whether estoppel can lie against the Plan under any circumstances, Pearson's evidence falls short here. Accordingly, the Plan's motion for summary judgment is granted, and Pearson's remaining claim is ordered dismissed. The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff.

**SO ORDERED** this    26th    day of October, 2009.

 s/ William C. Griesbach<br>
William C. Griesbach<br>
United States District Judge